**Opinion issued October 31, 2024.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00760-CV

————————————

**STARRY SKIES RANCH, L.P., JO ARC RESOURCES, INC., AND SALLY BLACKIE-SENGEL, Appellants**

**V.**

**CHAPPELL HILL CONSTRUCTION, CO., A TEXAS FOR PROFIT CORPORATION, Appellee**

---

**On Appeal from the 335th District Court**
**Washington County, Texas**
**Trial Court Case No. 36211**

---

## MEMORANDUM OPINION

Appellants Starry Skies Ranch, L.P., Jo Arc Resources, Inc., and Sally Blackie-Sengel hired Appellee Chappell Hill Construction, Co. to build a large home for Blackie-Sengel in Washington County, Texas. Chappell Hill sued Appellants

for breach of contract after Appellants failed to pay costs and retainage Chappell Hill contends were due under the construction contract. The jury found in favor of Chappell Hill on its breach of contract claim, and the trial court rendered judgment awarding Chappell Hill $352,022.47 in damages and $838,688.61 in trial and appellate attorney's fees.

On appeal, Appellants argue (1) there is no evidence supporting the jury's finding that they breached the construction contract, (2) the trial court abused its discretion by prohibiting them from introducing evidence concerning other construction defects that were settled prior to trial, and (3) the trial court abused its discretion by awarding Chappell Hill its attorney's fees.

We affirm the trial court's judgment.

**Background**

On March 6, 2012, Appellant Sally Blackie-Sengel, though her entities Appellants Starry Skies Ranch, L.P. and Jo Arc Resources, Inc. (collectively, "Blackie"), hired Appellee Chappell Hill Construction, Co. ("CHC") to build a home for Blackie-Sengel in Washington County, Texas. Blackie's architect, Ben Boettcher with BBA Architects, LP ("BBA"), designed the 20,000 square foot residence, which was to be built on a on a 205 acre tract. Among other things, and relevant to this appeal, the house included a 3,000 square foot detached garage, a 5,500 square foot deck, and a pool.

2

Blackie[1] and CHC executed a construction contract for the project consisting of the following documents: (1) a Standard Form of Agreement Between Owner and Construction Manager as Constructor (AIA Document A134 – 2009), and Revisions and Additional Provisions to the same document (collectively, "Standard Agreement"); and (2) the General Conditions to Contract for Construction (AIA Document A201-2007), and Revisions and Additional Provisions to the same document (collectively, "General Conditions"). We refer to the Standard Agreement and the General Conditions collectively as the Contract.

Three and a half years after construction on the house began, Blackie-Sengel fired Boettcher, the BBA architect for the project. The project continued without an architect until, eleven months later, Blackie-Sengel hired Suzanne Labarthe as Boettcher's replacement. Two weeks after Blackie-Sengel hired Labarthe, CHC issued a Certificate of Substantial Completion and provided Blackie-Sengel with the certificate and a punch list identifying items that needed completion or correction before the home was fully complete. Labarthe, however, refused to certify the project as substantially complete because she believed there were still issues with the pool, the floor of the detached garage, the deck, the soffits, and the interior doors of the house that precluded the home from being substantially complete.

---

[1]     Appellants Blackie-Sengel and Starry Skies Ranch, L.P. executed the contract with CHC.

After a month had passed and Labarthe had yet to certify the project as substantially complete, CHC sent to Blackie Payment Application 48 ("PayApp 48") for work performed on the project. PayApp48 included, among other things, costs for work on the pool and a charge for a second superintendent. CHC also sent to Blackie Payment Application 49 ("PayApp 49") for a portion of the retainage withheld under the Contract. CHC claimed that it was entitled to a portion of the retainage because it had achieved substantial completion, and Blackie and Labarthe's actions were materially delaying final completion of the home. According to CHC, Blackie breached the contract and materially delayed final completion of the project by delaying the hiring of a replacement architect for eleven months, hiring a replacement architect that had no knowledge or experience with the project, failing to follow the project's close out procedures, and failing to cooperate with CHC's efforts to finally complete the house.

Labarthe certified partial payment to CHC for PayApp 48, withholding approximately $10,000 attributable to costs for work on the pool and a second superintendent, and she refused to certify any payment for PayApp 49. Despite Labarthe's failure to certify payment in full for PayApp 48 and PayApp 49, CHC continued to correct or complete the items identified on its punch list, including issues with the pool, the floor of the detached garage, the deck, the soffits, and the interior doors of the house. When Blackie continued to refuse to pay the outstanding

4

amounts due under PayApp 48 and PayApp 49, CHC sued Blackie for breach of contract.

## The Trial Court Proceedings

### A.    Motion in Limine

In May 2017, CHC sued Blackie for breach of contract. Blackie asserted a general denial and counterclaimed against CHC for various alleged construction defects, including defects based on pool leaks, discolored soffits, and stains on the deck of the house. CHC filed third-party claims against the subcontractors and materialmen who performed work associated with the counterclaims. According to Blackie, "[t]he defects were the heart of the substantive litigation for the majority of the life of the suit."

The suit was initially tried to a jury on September 7, 2021. Prior to trial, the parties filed a joint motion in limine. Upon consideration of the joint motion, the trial court issued an order in limine which, among other things, prohibited Blackie from mentioning settled construction defects, except for defects that existed as of March 31, 2017. The order stated:

> SETTLED CONSTRUCTION DEFECTS: Defendants and their attorneys are prohibited from mentioning, referring, or presenting evidence on any affirmative claims for construction defects that have been settled or that have not been expressly referred to in Defendants' live pleadings. This limine does not preclude Defendants from presenting evidence of relevant construction defects that existed as of March 31, 2017 and to argue the same as a defense to payment under the terms of the construction contract at issue in this suit.

5

The first trial ended in a mistrial due to a family medical emergency. Blackie and CHC subsequently settled Blackie's counterclaims and CHC nonsuited its corresponding third-party claims against the subcontractors and materialmen before the second trial commenced on April 25, 2022.

Days before the second trial commenced, Blackie filed a motion to amend the order in limine to prohibit both parties from presenting evidence regarding affirmative claims for construction defects that had been settled. Blackie's proposed order in limine stated:

> SETTLED CONSTRUCTION DEFECTS: Any mention, reference, or presentation of evidence on any affirmative claims for construction defects that have been settled or that have not been expressly referred to in Defendants' live pleadings.

The trial court denied Blackie's motion to amend the order in limine and trial commenced.

## B. The Trial

### 1. Ray Andrejczak

Ray Andrejczak is a project manager with CHC, a general contractor located in Washington County that works on commercial and residential construction projects. In 2011, CHC owner Walt Schoenvogel met with BBA architect Boettcher and Blackie-Sengel to discuss construction of the home Boettcher was then designing for Blackie-Sengel.

6

In March 2012, Blackie hired CHC as the general contractor for the project and they executed the Contract setting forth the parties' respective obligations. Andrejczak served as CHC's project manager on the project and Brian Brantley served as the project superintendent. Under the terms of the Contract, Blackie agreed to pay CHC on a cost-plus basis, meaning CHC would be paid for the Cost of the Work plus a 10% construction manager's fee. Section 5.1 and 5.1.1 of the Standard Agreement provides:

> § 5.1 For the Construction Manager's[2] performance of the Work as described in Section 2.3, the Owner[3] shall pay the Construction Manager the Contract Sum in current funds for the Construction Manager's performance of the Contract. The Contract Sum is the Cost of the Work as defined in Section 6.1.1 plus the Construction Manager's fee.
>
> § 5.1.1 The Construction Manager's Fee paid during the Construction Phase shall equal ten percent (10%) of the Cost of the Work as defined in Section 6.1.1 . . . .

And Section 6.1.1 provides that the term "Cost of the Work" means "costs necessarily and reasonably incurred by the Construction Manager in the proper performance of the Work." The Contract contemplated that interim payments would be made to CHC during the course of the project through submitted payment applications and that 10% of any amount due would be held back as retainage.[4]

---

[2]    The Contract defines Construction Manager as CHC.

[3]    The Contract defines Owner as Blackie-Sengel and Starry Skies Ranch, L.P.

[4]    Section 7.1.1 of the Standard Agreement provides that "[b]ased on Applications for Payment submitted to the Architect by the Construction Manager and Certificates

7

Andrejczak testified that, in a nutshell, CHC was responsible under the Contract for "build[ing] the project per the construction documents," which included the plans, or the drawings prepared by the architect and the project manual. According to Andrejczak, CHC was not responsible for the design of the project, which had been designed entirely by BBA and its engineers.

In September 2012, CHC began construction on the project, which was supposed to take only two years to complete. According to Andrejczak, CHC submitted periodic applications for payment to Blackie and Boettcher, which billed Blackie for the Cost of the Work plus the 10% construction manager's fee. As the project's architect, Boettcher was responsible for, among other things, advising Blackie regarding the project's progress, reviewing CHC's payment applications, assessing whether the work subject to the payment applications had been performed in accordance with the Contract, and certifying CHC's applications for payment.

In January 2016, three and a half years after construction on the project began, Blackie's attorney, Stuart Wilson, informed CHC that Blackie had terminated Boettcher's employment on the project and had arranged for another architect to review the payment applications and "address any issues that might arise needing an

for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Construction Manager as provided below and elsewhere in the Contract Documents."

8

architect's assistance." Wilson instructed CHC to send future payment applications to Blackie-Sengel and her financial advisor, Tom Neville.

Section 4.1.1 of the General Conditions provides that the "Owner shall retain an architect," and Section 4.1.3 states that if "the employment of the Architect is terminated, the Owner shall employ a successor architect . . . ."[5] Andrejczak testified that although Blackie had a contractual obligation to employ an architect for the duration of the project and to employ a successor architect if the previous architect's employment was terminated, Blackie did not hire an architect to replace Boettcher until December 2016—eleven months after Boettcher's employment had been terminated.

Despite not having an architect, CHC continued its work on the project during those eleven months. Andrejczak testified that CHC, which had been working on the project for over four years, wanted to close out the project and get paid. According to CHC, the project contemplates a three-step closeout procedure. Step one of that procedure is "substantial completion," which Section 9.8.1 of the General

---

[5] Section 4.1.1 of the General Conditions fully states, "The owner shall retain an architect lawfully licensed to practice architecture or an entity lawfully practicing architecture in the jurisdiction where the project is located. That person or entity is identified as the architect in the agreement and is referred to throughout the contract documents as if singular in number." Section 4.1.3 fully states that "[i]f the employment of the Architect is terminated, the Owner shall employ a successor architect as to whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the Architect."

9

Conditions defines as that "stage when the Work or a designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use." When CHC "considers that the Work . . . is substantially complete," Section 9.8.2 provides that CHC "shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected prior to final payment."[6]

Andrejczak testified that by November 2016, the project was approaching the substantial completion stage and CHC began compiling a final punch list to identify the items that needed completion or correction before the project could be finalized. Andrejczak testified that the project was substantially complete on December 30, 2016, and on that day, he issued and signed a Certificate of Substantial Completion.

On December 20, 2016, Blackie-Sengel informed CHC that she had hired Suzanne Labarthe as the new architect for the project. On December 29, 2016, Labarthe sent an email to CHC introducing herself as Blackie's new architect. On January 4, 2017, CHC submitted to Blackie-Sengel and Labarthe the Certificate of Substantial Completion Andrejczak had previously issued, along with a detailed, 19-

---

[6]     Section 9.8.2 fully states:

> When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

10

page punch list of outstanding items CHC had begun compiling in November 2016. According to CHC, that triggered Labarthe's contractual obligation under the second step of the closeout procedure to act without delay. Specifically, Section 9.8.3 of the General Conditions states that

> Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or a designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

Andrejczak testified that after sending the Certificate of Substantial Completion and CHC's punch list to Labarthe on January 4, 2017, CHC had "difficulty getting any kind of cooperation whatsoever" and they could not get Labarthe to "even look at [the] punch list." Instead of working off CHC's detailed punch list, Labarthe began sending emails in January 2017 enclosing nondescript photographs she had taken of the project. Andrejczak testified that this was a big project, and they needed a single, comprehensive punch list to circulate to the subcontractors.

On January 25, 2017, three weeks after first receiving CHC's punch list, Labarthe e-mailed Blackie-Sengel a 49-page email of photographs with a copy to

Andrejczak with the subject line, "Jan. 5 walk through annotated photos." The body of the message stated only, "Some photos for discussion." The following day, Labarthe sent a second email to Blackie-Sengel with a copy to Andrejczak attaching photos she had taken during her January 12, 2017 site inspection. Andrejczak testified that he could not tell if the photographs Labarthe attached to her emails were intended to identify problems with the project for correction because the emails merely stated that the photographs were "for review" or "for discussion." According to Andrejczak, CHC could not figure out where in the home the photographs had been taken or what problems, if any, the photographs intended to convey. Labarthe sent another email on February 20, 2017, attaching new photographs, which she described as part of her "pictorial punch list."

On February 2, 2017, CHC issued PayApp 48 for final materials and labor supplied on the project in the amount of $210,203.16, and PayApp 49 for retainage in the amount of $544,115.24. Andrejczak testified that PayApp 49 did not reflect the entire outstanding retainage balance. Rather, in PayApp 49, CHC invoiced Blackie for $544,115.24 of the retainage balance of $567,873, and it withheld $23,758.47 in retainage "to take care of any remaining punch list items that might come up." He explained that the "architect needed to respond within seven days of this billing and let [CHC] know if this [was] acceptable, not acceptable, if we need to make other concessions, if that amount, [$23,758.47], needs to be increased."

12

On February 21, 2017, Labarthe certified payment for PayApp 48 in the amount of $199,498.59, representing the invoiced amount less $10,704.57 for purported problems with the pool and charges attributable to a "second (unauthorized) superintendent." With respect to the withheld $10,704.57, Andrejczak testified that $5,555.55 reflected work done on the pool, which according to CHC, was 100% complete. The remainder reflected costs for a second site superintendent, which Andrejcsak testified CHC had to retain because CHC was trying to wrap up the project and Blackie-Sengel was taking up too much of Brantley's time. Labarthe, however, refused to certify payment for the superintendent or the pool. She noted on PayApp 48, "Reduced for Second (Unauthorized) Superintendent," and for the pool she noted, "Reduced by $5,555.55 until all leaks are resolved." Andrejczak testified that there was "moisture that was forming up underneath the pool in the basin."

According to Andrejczak, Labarthe was difficult to work with and she did not "do[] what the construction documents said []she was supposed to do." Andrejczak testified that in addition to refusing to certify the project as substantially complete and working with CHC to compile a single comprehensive punch list in a timely fashion, Labarthe refused to certify PayApp 48 and PayApp 49 for payment.

According to Andrejczak, Blackie-Sengel and Labarthe withheld payment for PayApp 49 because there were alleged outstanding issues with the interior doors,

13

pool, deck, soffits, and the floor of the detached garage. Andrejczak testified that Blackie-Sengel refused to pay PayApp 49 in part because there was a 1/8-inch gap around the escutcheon plates installed on the interior doors. According to Andrejczak, the gap existed because Blackie-Sengel and BBA had chosen the incorrect escutcheon plate in contravention of the Contract. Andrejczak testified that although CHC had installed the doors in compliance with the Contract, they nevertheless offered to fix the problem by installing new escutcheon plates which would have eliminated the gap at a nominal expense. Blackie-Sengel and Labarthe refused the offer and demanded that CHC pay to install new interior doors throughout the house.

Blackie-Sengel also withheld payment for PayApp 49 because there were stains and scuff marks on parts of the 5,000 square foot deck. Andrejczak testified that the deck, which had been constructed in accordance with the Contract, had initially been sealed, but Blackie-Sengel changed her mind and had the deck stripped back to the natural wood to allow it to take on a natural weathered patina. Andrejczak testified that Blackie-Sengel and Labarthe identified some scuff marks and yellow stains in isolated locations near the pool that totaled only thirty to forty square feet. CHC offered to sand down the stains and scuff marks, but Blackie-Sengel rejected the offer, insisting instead that CHC sand down the entire 5,000 square foot deck. Andrejczak explained it was not necessary to sand the entire deck

14

because the sanded down portions would take on a consistent naturally weathered patina once repaired.

In addition to withholding payment for a portion of PayApp 48 based on pool leaks, Blackie-Sengel withheld payment under PayApp 49 for the same reason. CHC repaired some pool leaks in February and March 2017, but there was still water accumulating in the basin underneath the pool. On April 7, 2017, American Leak Detection determined that the pool was not leaking, and that the water observed was likely condensation collecting in the catch basin underneath the pool. CHC continued testing the pool and doing "everything possible to try to check and see if there was any other leak because that just didn't satisfy" Blackie and Labarthe. According to Andrejczak, CHC "never could find a leak," which confirmed American Leak Detection's theory that the moisture underneath the pool was from condensate.

Andrejczak testified that even though it was not CHC's responsibility, CHC nevertheless continued to work with Blackie-Sengel for several months after CHC filed suit against Blackie to address Blackie-Sengel's and Labarthe's concerns with the pool. On September 12, 2017, Blackie-Sengel sent Andrejczak an email stating that there were "still few, possibly insignificant, drips" under the pool but, she agreed they needed to "push on." CHC performed subsequent tests on the pool but they "still couldn't find any issues with any leaks." According to Andrejczak, the pool

had been built in accordance with the Contract plans and specifications and by this point, any existing leaks in the pool had been resolved. Andrejczak testified that even after Blackie-Sengel recognized that the pool leaks had been resolved in September 2017, Blackie continued to refuse to pay the outstanding balance for the pool.

There were also some issues involving cracks in the floor of the detached garage. Andrejczak testified that the design for the detached garage changed from a structural slab foundation to a slab-on-grade foundation against the geotechnical engineer's recommendations. According to Andrejczak, Blackie's structural engineer determined that the cracks were shrinkage cracks, which are a normal part of the curing process. Andrejczak testified that the cracks were not caused by CHC's failure to comply with the Contract.

CHC also installed soffits at the roof's edge throughout the exterior of the house. They were staggered in individual sections of approximately ten to fifteen feet in length. Andrejczak testified that Blackie-Sengel and Labarthe complained about white stains on a few of the individual soffit sections that appeared after the soffits had been cleaned. CHC agreed to sand down and re-stain each of the affected soffits and offered an extended one-year warranty, but Blackie-Sengel and Labarthe demanded that CHC sand down and re-stain every soffit, even though there were no construction defects and regardless of whether they had water stains.

16

Andrejczak testified that although the items on the punch list had not been corrected or completed when CHC submitted PayApp 49 on February 2, 2017, all items on the punch list had been corrected when CHC sued Blackie in May 2017. When asked if there were still open items from the original scope of work that required work, Andrejczak testified that "work had been completed except for the outstanding issues that the owner had," including the stains on some of the soffits. Andrejczak testified that they had set aside money to address the soffits, but Blackie did not agree to CHC's proposed remedy. According to Andrejczak, the soffits were a punch list item included on an action plan, but it was not an "accepted item." According to Andrejczak, there were boot prints on the floor of the garage which CHC had proposed to buff out, but Blackie wanted epoxy flooring and CHC "agreed to pay for that." After CHC sued Blackie, CHC continued to "take care" of things if Blackie had a problem and he agreed that CHC was "still working on the project."

Andrejczak agreed that the project was not fully or finally complete in the summer of 2017 because there were "outstanding issues that [CHC and Blackie] couldn't come to an agreement on." When asked if CHC was entirely done with its original punch list when it filed suit, Andrejczak testified, "Except for the items that we spoke of earlier, which would be if there was still an issue with the soffit, I think I had a punch list item that said full operation of the pool. There [were] some issues,

17

still some things like that on our punch list, but all of the other punch list items should have been completed by that time."

CHC introduced into evidence a video showing the exterior and interior of the home, which according to CHC would have allowed the jury to assess whether the house was substantially complete in December 2016, allowing Blackie-Sengel to move in and occupy the home. According to Andrejczak, the video showed "pretty much what [the home] looked like" in December 2016. Andrejczak testified that the house was in the same condition when he issued the Certificate of Substantial Completion on December 30, 2016, and the issues Blackie had identified with the deck, pool, detached garage, soffits, or interior doors would not have prevented her from using or occupying the home.

Despite repeated requests for Labarthe to certify that the project was substantially complete, Labarthe never did so. Andrejczik testified that Labarthe's refusal to certify substantial completion stymied CHC's efforts to complete the project and receive the final payment due under the Contract because without the certificate of substantial completion, "You can't move forward from there. You're stalemated. You're stuck."

When asked if substantial completion entitled CHC to final payment, Andrejczak testified that CHC had to submit a Certificate of Substantial Completion with a punch list, and CHC had to "complete those punch list items before [doing

18

the] final billing." He testified that PayApp 49 was "the final billing for the retainage" but that CHC needed "to complete the punch list items for the final billing." When asked if CHC was demanding payment of the retainage when it issued PayApp 49 in February 2017, Andrejczak testified:

> No. Not until after we completed the punch list items. That's why we were striving to get the punch list—get the substantial completion signed, get all of the punch list items combined, so we could actually bill for the final billing.
>
> We finally got to the point in February [2017] that we couldn't get all— everything put together. We couldn't get anybody to help us on the owner's or architect's side, to finish combining a list, so we billed for the retainage and we kept a certain portion of that out to take care of any remaining punch list items that might come up.

According to Andrejczak,

> We [were] supposed to wait until the punch list items [were] complete before we issue[d] final billing. We weren't issuing final billing here, we were pulling out $23,000 before we'd do that. The architect needed to respond within seven days of this billing and let us know if this is acceptable, not acceptable, if we need to make other concessions, if that amount, $23,000, needs to be increased. We were trying to bring this thing to a closure, get it to an end; we were trying to get to the end of the road of this, and it just kept getting pushed back and pushed back. So this was a means to bring this up in front of everybody.

Andrejczik testified that the retainage was not due and payable until all the punch list items were addressed. PayApp 49 "was not the final billing. That was a partial on the retainage." Andrejczik testified that the final Application for Payment would have included the $23,000 in retainage held back from PayApp 49.

19

Section 7.2 of the Standard Agreement provides that "final payment" constituting "the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Construction Manager when (1) the Construction Manager has fully performed the Contract except for the Construction Manager's responsibility to correct Work as provide in Section 12.2.2. of AIA Document A201-2007, and to satisfy other requirements, if any, which extend beyond final payment;" (2) "the Construction Manager has submitted a final accounting for the Cost of the Work and a final Application for Payment;" and (3) "a final Certification for Payment has been issued by the Architect." Andrejczik testified that he was responsible for preparing the final accounting for the Cost of the Work and he explained in detail how he compiled the final accounting, which he submitted to Blackie.

Among other things, Andrejczak testified that every cost item was included in the final Application for Payment continuation sheet and schedule of values, and he explained how all costs were calculated and that the costs were a summary of the detailed accounting set out in the job cost detail report he compiled. Andrejczak explained how the two were tied together and that he reconciled them to ensure the information was correct. He also testified that Blackie-Sengel reviewed and approved CHC's accounting system and procedures.

Andrejczak testified that CHC was seeking to recover (1) the $10,704.57 Labarthe refused to certify for payment and had withheld under PayApp 48 for the

20

pool and second superintendent, (2) the $544,115.24 in retainage due under PayApp 49, which Labarthe never certified for payment, (3) the $23,758.47 in retainage CHC held back from PayApp 49 to cover any additional work on the project, and (4) $34,951.57 in unbilled costs CHC had discovered during the course of the litigation. CHC also sought to recover its attorney's fees.

### 2. Sally Blackie-Sengel

Blackie-Sengel initially retained Boettcher from BBA as her architect on the project, but she terminated his employment in January 2016.[7] Blackie-Sengel testified that she tried to hire a new architect for months after she terminated Boettcher even though she did not think she needed one and no one told her she needed to find a replacement architect. She hired Labarthe in December 2016 and Labarthe, who had no experience with the project, started to educate herself and get up to speed on the project, which Blackie-Sengel testified was no small task given the scope of the work that had been underway for over four years.

On January 4, 2017, CHC notified Blackie-Sengel and Labarthe that the project was substantially complete and CHC provided them with a Certificate of Substantial Completion together with a comprehensive, 19-page page punch list with the items that needed correction prior to final completion of the project. Blackie-

---

[7] Blackie later filed suit against BBA in a separate matter, which remained pending at the time of trial in this case.

Sengel did not agree that the project was substantially complete. According to Blackie-Sengel, the home was not ready for occupancy in January 2017 because, in addition to the dust that would be generated by work on many of the items on the punch list, there were no light switches in the home, and she could not control the air conditioning unless she went down into the basement where the thermostats were located. After she and Labarthe met with Andrejczak on January 27, 2017, Blackie-Sengel understood that CHC would continue to work on the project because the home was not fully complete and there were still issues with interior doors, the soffits, the deck, the garage barn foundation, and the pool. Blackie-Sengel agreed that CHC, which was not responsible for the design of the project, was only required to perform the work in compliance with the Contract.

Blackie-Sengel testified that she and Labarthe worked with CHC to compile a complete list of punch list items, and to complete and correct the items on the list. To reach agreement on the big ticket items, including the pool, deck, and soffits, Blackie and CHC agreed to meet on April 17, 2017. On April 6, 2017, Blackie-

Sengel sent an email to Labarthe, her financial advisor Neville, and her attorney Wilson to discuss the upcoming April 17 site inspection, stating:

> Here are my thoughts on the meeting:
>
> I don't think that it will change Walt's[8] mind that he will think the house isn't finished.
>
> It might surprise his attorney at details not completed and the attorney might change Walt's mind after the meeting.
>
> I think that it will pave the road to what I would like to do legally. That is, get it all finished and charge back to CHC those expenses they refuse to acknowledge are theirs. I generally see those are the pool leak, the deck sanding and the damage to the soffits. There are misc other items that added together will add a few more thousand dollars. Also there needs to be an agreement on handling the foundation problem of the barn and the lack of crickets of roof. These could be rectified by stronger warranties and/or a cash reimbursement of damages.
>
> Any thoughts from the team?

Blackie-Sengel denied she was contemplating suing CHC when she sent the email. She testified that when she used the word "legally" in her email she only meant that she wanted to handle her disputes with CHC properly, as opposed to illegally or being underhanded.

CHC sued Blackie for breach of contract on May 17, 2017. Blackie-Sengel testified that the project was not complete when CHC filed suit and the issues with the pool, deck, soffits, interior doors, and garage floor had not been resolved.

---

[8] Walt Schoenvogel is CHC's owner.

23

Blackie-Sengel testified that the interior doors had not been built correctly because there was a gap around the escutcheon plate. She did not recall CHC offering to eliminate the gap by removing the existing escutcheon plates and replacing them with specially fabricated plates at its own cost.

Addressing the cracks in the floor of the detached garage, Blackie-Sengel acknowledged that the design for the detached garage had changed from a structural slab foundation to a slab-on-grade foundation against the geotechnical engineer's recommendations. She testified that CHC was required to construct the detached garage's foundation in accordance with the Contract's specifications and plans and if CHC had done so, it was entitled to be paid for the work. According to Blackie-Sengel, no one had pointed out to her a specification for the detached garage that CHC had not complied with. Blackie's structural engineer determined that the cracks were shrinkage cracks, which are a normal part of the curing process. When the cracks first appeared, they were routed and sealed. Blackie eventually hired someone to apply an epoxy coat to the garage barn's floor and install a moisture barrier and French drain around the perimeter of the building. When asked why she was holding CHC responsible for cracks in the garage's foundation even though CHC had constructed the foundation in compliance with the Contract and the cracks were a normal part of the curing process for a slab-on-grade foundation, Blackie testified, "Well, this cost me extra money to repair."

24

Blackie-Sengel also testified that CHC had found and repaired a few pool leaks by March 2017, and had brought out American Leak Detection to inspect the pool. American Leak Detection determined that the pool was not leaking, but that there was water appearing in the basin underneath the pool, which it concluded was likely condensation. Although Blackie-Sengel admitted it was not CHC's responsibility to fix the condensation issue, she emailed Andrejczak in September 2017, stating there were "still few, possibly insignificant, drips" under the pool but she agreed they needed to "push on." Blackie-Sengel testified that she wanted to "push on" because she was tired of dealing with the pool, but not that she was agreeing that the pool issues had been resolved. According to Blackie-Sengel, CHC was not entitled to be paid the $5,500 Labarthe had held back from PayApp 48 for the pool because there "were problems with the pool besides leaking." Blackie-Sengel admitted that "the moisture problems and the leaks are . . . one of the reasons why [she] withheld payment" and those issued had since been resolved.

Blackie-Sengel also testified that there were scuff marks and stains on portions of the large exterior deck. Blackie-Sengel, Schoenvogel, Andrejczak, Brantley, and Labarthe met at the house and discussed problems with the deck. Blackie-Sengel testified that Schoenvogel agreed to re-sand the entire deck to correct the isolated stains and scuff marks and she thought it was reasonable to expect CHC to re-sand the entire deck because it was a new house.

25

Blackie-Sengel moved into the house in November 2017, at which time Blackie and Labarthe presumably believed the project was at least substantially complete. Blackie-Sengel testified that she ordered a set of keys for the house because CHC never gave her keys. When asked about the $34,000 in additional outstanding project charges CHC had discovered during the litigation, Blackie-Sengel testified that so long as they were charges for the project "they need to be paid."

### 3. Suzanne Labarthe

Labarthe, who was not familiar with the project when Blackie hired her in December 2016, testified that she needed time to educate herself and it took her several months to get up to speed. According to Labarthe, the project had been without an architect "for far too long."

Labarthe testified that the Contract's close out procedures required her to walk through the project and prepare a punch list identifying items that needed correction or completion. Labarthe testified that she walked the project using CHC's punch list, but that CHC never asked her to walk through the project with them using the punch list. Labarthe testified that for months after CHC sent its initial 19-page list on January 4, 2017, she sent several emails to CHC with dozens of photographs of items for the punch list, because she was still becoming familiar with the project. She admitted that most of the items depicted in her pictorial punch list were cosmetic or

aesthetic items. Labarthe testified that CHC did not fully cooperate with her efforts to prepare a comprehensive punch list and resolve the items on the list so that she could certify substantial completion.

Labarthe testified that substantial completion is defined in the Contract as the state that a building is in so that an owner may occupy the building. When asked how she determined whether an owner could occupy a home, Labarthe testified that it depended on:

> how many items of correction I could identify that would require a kind of constant stream of workers perhaps or a lot of noise or interruptions or fumes or dust or all those sorts of things that none of us would want to occupy a house in. So that's kind of like a baseline for me. It has to be at a point where none of that is going to be a disruption to the possibility of living in it, otherwise it would just be camping out, maybe, you could call it.

Labarthe, who acknowledged that the project was substantially complete as of the time of trial, testified that she never signed a Certificate of Substantial Completion or certified payment for PayApp 49. Labarthe testified that the main issues that prevented the project from being substantially complete and why she refused to certify payment for PayApp 48 and PayApp 49 were the cracks in the floor of the detached garage, moisture leaks in the pool, scuff marks and stains on the exterior deck, spotting on the soffits, and the 1/8-inch gap on the interior doors.[9]

---

[9] Labarthe testified that there were also issues with the walls in the guest quarters.

27

In her February 20, 2017 email to CHC, Labarthe stated that she had visited the project site on February 8, 2017 in response to a request from CHC to certify the project for substantial completion and in her professional opinion, "there were (and still are) too many outstanding punch list corrections and some large unresolved problems which prevent this project from being considered substantially complete. This opinion was reinforced by my 2/15/17 site visit." On March 22, 2017, Labarthe sent another email to CHC in which she stated there were significant remaining issues of concern that were impacting her decision on substantial completion, including the "unresolved" pool leaks, cracks in the detached garage's slab, and stains on some soffits.[10]

When asked if CHC had constructed the detached garage in accordance with the Contract, Labarthe admitted that she had previously testified that the detached garage's slab did not deviate from the structural or the architectural drawings. Labarthe testified that there were modifications made to the pool's design change and she did not know if the pool had been built in accordance with the Contract's

---

[10]  When asked whether "substantial completion" is discussed in the Contract, Labarthe testified that it was discussed in the project manual, which contains a "list of about 14 items that need to be satisfied. So that's in the specifications." *See* Project Manual, Section 01770–Closeout Procedures, Part 1 – General, 1.3 Substantial Completion (stating "[b]efore requesting inspection for determining date of Substantial Completion, complete the following" and listing fourteen items). This provision in the project manual, however, does not modify the express definition of the term "substantial completion," but rather adds tasks for CHC to complete prior to asking Labarthe to determine the date of substantial completion.

plans and specifications because she never received the revised drawings.  Labarthe did not agree with American Leak Detection's opinion that the moisture in the basin underneath the pool was condensation.  Labarthe, who testified that Blackie-Sengel eventually replaced the pool, was unaware that the new pool's basin also has a moisture problem.

Addressing the deck issues, Labarthe testified that sanding down the entire 5,500 square feet deck was more reasonable than spot sanding it and, according to Labarthe, CHC had committed to sand down the entire deck to correct the yellow stains and scuff marks.  She agreed that CHC's offer to sand down the affected soffits and re-stain them and include an additional one-year warranty to ensure against the soffits aging differently was "not an unreasonable proposal."

Labarthe testified that her primary complaint "about the [interior] doors was th[e] gapping around the escutcheon plate."  CHC was responsible for ordering the doors and making sure they were mortised, and BBA was responsible for picking the hardware for the interior doors.  According to Labarthe, the gaps were the result of CHC's failure to ensure that the doors were mortised correctly.  Labarthe was not aware that CHC had offered to fix the gaps by replacing the escutcheon plates with specially fabricated commercial escutcheon plates that would fill in the gap.  Labarthe testified that CHC's proposal approach "would have been possibly fine" if the new places fit precisely, but "there were other issues with the doors."

29

### 4. Brian Brantley

Brian Brantley, the Project's site superintendent, testified that the project was substantially complete as of December 30, 2016, because at that time Blackie could have occupied or utilized the house for its intended purpose. According to Brantley, Labarthe did not walk the project with him to address CHC's punch list despite his multiple requests for her to do so. Instead, Labarthe sent a series of emails with nondescript photographs, some of which related to items that were already on CHC's punch list. Brantley and CHC tried to locate and identify the items in Labarthe's photographs, but they were unable to find all of them. According to Brantley, even Labarthe did not know where to find some of the items she had photographed. Brantley testified that most of the items Labarthe identified were minor in nature, work that had been properly performed in accordance with the Contract, or design-related issues (as opposed to construction-related issues) for which CHC was not responsible.

Brantley testified that the delay in receiving a complete punch list was problematic and delayed CHC's efforts to close out the project and receive final payment. Brantley testified that it took time to locate many of the items identified by Labarthe and that the delay in receiving the requested items posed problems for their subcontractors who often had to return to work on the project as new items were identified, and some of those subcontractors had already left the project.

30

One of the problems Labarthe identified were scuff marks and yellow stains on some of the planks of the exterior deck. Brantley testified that although the deck had initially been finished, Blackie-Sengel changed her mind and had the deck stripped down to the natural wood allowing it to reach a natural weathered patina appearance. Brantley testified that CHC had offered to sand down the yellow stains and scuff marks and that the repaired portions of the deck would have taken on a consistent naturally weathered patina.

Brantley testified that the Project was substantially complete on December 30, 2016, because at that time Blackie-Sengel "could have moved into that house, turned on the air-conditioning, moved [her] furniture in there, moved in, and lived there." When asked about the house lights, Brantley testified that although the programming was not complete, the lights were nevertheless operable, and the light switches worked. When asked about the house keys, Brantley testified that CHC had temporary locks on several doors and Blackie-Sengel had keys to those doors and "keys to get in and out of the building."

### Jury Findings, Judgment, and Post-Judgment Motions

The jury found that Blackie-Sengel and Starry Skies Ranch had failed to comply with the Contract and that their failure to comply was not excused.[11] The

---

[11] The jury was instructed that Blackie-Sengel's and Starry Skies Ranch, L.P.'s failure to comply with the contract was "excused if [CHC] previously failed to comply with

jury found that $352,022.47 would fairly and reasonably compensate CHC for the damages it sustained as a result of Blackie-Sengel's and Starry Skies Ranch's failure to comply with the Contract. The jury also found that Blackie-Sengel and Starry Skies Ranch had not promptly paid the amounts owed under PayApp 49 for properly performed work or suitably stored materials, and that their failure to comply was not excused. The jury awarded CHC $838,688.61 in trial attorney's fees and $50,000 in conditional appellate attorney's fees.

Blackie filed a motion for judgment notwithstanding the verdict arguing there was no evidence supporting the jury's finding she had failed to comply with the Contract because CHC had not established its compliance with the terms of Contract entitling it to payment. Blackie also argued there was no evidence supporting the jury's damage award because CHC had not established it had suffered any damages as a result of Blackie's failure to hire a replacement architect, and CHC had not presented sufficient evidence for the jury to evaluate whether CHC had properly segregated its attorney's fees claims between recoverable and non-recoverable claims.

The trial court denied Blackie's motion for judgment notwithstanding the verdict and rendered final judgment in favor of CHC on its breach of contract

---

a material obligation of the same agreement" or their compliance with the contract had been "waived by CHC."

32

claim.[12]  It awarded CHC $352,022.47 in actual damages, $838,688.61 in trial attorney's fees, and $50,000 in conditional appellate attorney's fees.  This appeal followed.

## Breach of Contract

In its first issue, Blackie argues there is no evidence supporting the jury's finding that it failed to comply with the Contract.  Blackie first argues it did not fail to comply with the Contract when it refused to pay PayApp 49 "composed entirely of retainage" because retainage was not due until CHC "fully performed" the Contract.  Blackie argues CHC was not entitled to receive final payment for its work on the project because CHC failed to provide Blackie with (1) a final accounting for the Cost of the Work, (2) a final Application for Payment, and (3) a final Certificate for Payment, as required by the Contract.

Blackie also argues that CHC is not entitled to recover the $10,704.57 Labarthe withheld from PayApp 48, because CHC's unilateral decision to retain a second superintendent was "not authorized by the Contract" and problems with the pool remained when the application was issued and persisted even after CHC filed suit.  Blackie thus argues that Labarthe was "within her contractual right to deny a small portion of that payment application allotted to the pool."  Blackie further argues that CHC was not entitled to recover the $23,758.47 in retainage it withheld

---

[12]     Blackie filed a motion for new trial on the same basis which the trial court denied.

from PayApp 49 and the $34,519 in costs CHC learned about during the litigation because CHC never billed Blackie for those amounts as required by the Contract.

Blackie argues that to the extent CHC contends that Blackie failed to comply with the Contract by not hiring a replacement architect for several months, CHC is not entitled to damages for such a breach. She argues that CHC continued to perform the Contract during that time and CHC failed to prove it incurred any damages resulting from Blackie's failure to hire a new architect.

CHC responds that there is sufficient evidence supporting the jury's finding that Blackie failed to comply with the Contract because CHC presented evidence it performed the disputed work in accordance with the Contract's plans and specifications, CHC complied with the Contract's closeout procedures, and Blackie failed to comply with multiple contractual obligations, including its obligation to pay CHC for the Cost of the Work. CHC argues there is evidence (1) the project was substantially complete in accordance with the Contract notwithstanding Blackie and Labarthe's refusal to acknowledge that the project was substantially complete, (2) Blackie, acting by and through its agent and representative Labarthe, failed to comply with the closeout obligations under Section 9.8.3 of the Contract which were triggered upon receipt of CHC's January 2017 punch list, (3) Blackie failed to comply with the Contract by failing to retain an architect for eleven months, (4) Blackie's failure to retain Labarthe, the replacement architect, until the end of

34

the project caused delays and interference with the project's close out, and (5) because the project was substantially complete and final completion was delayed for reasons not attributable to CHC, CHC was entitled to payment of the balance due for the portion of the project that had been completed fully at that time. According to CHC, Blackie's failure to pay was not excused because the alleged defects Blackie relied on to withhold payment had either been completed in conformance with the Contract's plans and specifications or Blackie had refused CHC's offers to cure any defects.

## A.    Standard of Review[13]

Courts may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence on a vital fact, (2) the court is barred by the rules of evidence from giving weight to the only evidence offered in support on a vital fact, (3) no more than a scintilla of evidence is offered in support of the vital fact, or (4) the evidence offered at trial conclusively establishes the opposite of the vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 657 (Tex. 2018).

In a legal sufficiency, or no-evidence review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In

---

[13]    CHC construes Blackie's first issue as a legal sufficiency challenge and Blackie does not disagree with that assessment in her reply brief. We thus construe and analyze Blackie's first issue as a legal sufficiency challenge.

conducting our review, we credit favorable evidence if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id.* at 822. "If there is any evidence of probative force to support the finding, i.e., more than a mere scintilla, we will overrule the issue." *City of Hous. v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.— Houston [1st Dist.] 2008, pet. denied) (citing *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005)). When the evidence offered to establish a vital fact is so weak it creates a mere surmise or suspicion of the vital fact's existence, the record contains less than a scintilla. *JBS Carriers, Inc. v. Wash.*, 564 S.W.3d 830, 840.

When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). The jury, as the fact finder, is the sole judge of the witnesses' credibility and the weight to give their testimony. *Gunn*, 554 S.W.3d at 665 (citing *City of Keller*, 168 S.W.3d at 819). "It is the province of the jury to resolve conflicts in the evidence, and when reasonable jurors could resolve conflicting evidence either way, we presume they did so in accordance with the verdict." *Id.* (citing *City of Keller*, 168 S.W.3d at 820). We must defer to the jurors' determination of these matters and

their resolution of conflicting evidence. *Id.* (citing *City of Keller*, 168 S.W.3d at 820).

**B.    Applicable Law**

To recover for breach of contract, a plaintiff must establish (1) the existence of a valid contract, (2) performance or tendered performance under the contract, (3) a breach by the defendant, and (4) damages resulting from the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019); *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Performance is generally a question of fact. *See Grayco Town Lake Inv. 2007 LP v. Coinmach Corp.*, No. 03-15-00088-CV, 2016 WL 7335862, at *5 (Tex. App.—Austin Dec. 16, 2016, no pet.) (mem. op.) ("[T]o the extent there is a dispute, whether the parties' conduct constituted breach or performance, is a question for the fact finder."); *M7 Cap. LLC v. Miller*, 312 S.W.3d 214, 222–23 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (analyzing performance as question of fact).

**C.    Analysis**

Blackie argues that under the Contract, retainage was not due until after final payment, and CHC was not entitled to final payment because CHC (1) did not fully perform the Contract, (2) submit a final accounting for the Cost of the Work,

37

(3) submit a final Application for Payment or (4) obtain a Certificate for Payment from Labarthe, as required by the Contract.

### 1.    Substantial Completion

Blackie argues that contrary to CHC's position, retainage is not due under the Contract upon substantial completion, and thus, she did not fail to comply with the Contract when it did not pay PayApp 49 after CHC submitted the application for payment in February 2017.  She also disputes that the house was substantially complete in December 2016.

Contrary to Blackie's argument, CHC does not argue that retainage was due when it submitted PayApp 49 based on the status of the home as substantially complete.  Rather, CHC argues that Labarthe's refusal to cooperate with CHC or to certify substantial completion stymied CHC's efforts to complete the project and receive the final payment due under the Contract because without the certificate of substantial completion, "You can't move forward from there. You're stalemated. You're stuck."  CHC's project manager Andrejczik admitted that the retainage was not due and payable until all punch list items were corrected or completed. When asked if CHC was demanding payment of the retainage when it issued PayApp 49 in February 2017, Andrejczak testified, "No. Not until after we completed the punch list items. That's why we were striving to get the punch list—get the substantial completion signed, get all of the punch list items combined, so we could actually bill

for the final billing." He testified that Blackie and Labarthe had not been cooperating with CHC to create a comprehensive punch list so CHC "billed for the retainage and [it] kept a certain portion of that out to take care of any remaining punch list items that might come up." According to Andrejczak, CHC was "trying to bring this thing to a closure, get it to an end; we were trying to get to the end of the road of this, and it just kept getting pushed back and pushed back. So this was a means to bring this up in front of everybody."

Blackie and CHC presented conflicting evidence as to whether the home was substantially complete in December 2016, before CHC submitted PayApp 49. Section 9.8.1 of the General Conditions defines substantial completion as that stage "when the Work or a designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use." According to Blackie-Sengel, the home was not ready for occupancy in January 2017 because, in addition to the dust that would be generated by work on many of the items on the punch list, there were no light switches in the home, and she could not control the air conditioning unless she went down into the basement where the thermostats were located. Labarthe testified that the main issues that prevented the project from being substantially complete and why she refused to certify payment for PayApp 48 and PayApp 49 were the cracks in the

39

floor of the detached garage, moisture leaks in the pool, scuff marks and stains on the exterior deck, spotting on the soffits, and the 1/8-inch gap on the interior doors.

Brantley and Andrejczak for their part testified that the project was substantially complete on December 30, 2016. CHC introduced and played a video for the jury that according to Andrejczak reflected what the house looked like in December 2016. He testified that the house was in the same condition when he issued the Certificate of Substantial Completion on December 30, 2016, and that the issues Blackie-Sengel had identified with the deck, pool, detached garage, soffits, or interior doors would not have prevented her from using or occupying the home. Brantley similarly testified that Blackie-Sengel could have occupied or utilized the house for its intended purpose in December 2016, because at that time Blackie-Sengel "could have moved into that house, turned on the air-conditioning, moved their furniture in there, moved in, and lived there." When asked about the house lights, Brantley testified that although the programming was not complete, the lights were nevertheless operable, and the light switches worked.

The jury thus heard conflicting testimony and evidence on the issue of substantial completion. The jury, as the fact finder, is the sole judge of the witnesses' credibility and the weight to give their testimony. It was thus within the jury's province to resolve conflicts in the evidence on this issue, and we defer to the jurors'

resolution of conflicting evidence. *See Gunn*, 554 S.W.3d at 665 (citing *City of Keller*, 168 S.W.3d at 820).

## 2. Full Performance of the Contract

CHC argues that it complied with its obligations under the Contract entitling it to final payment. By contrast, CHC argues that Blackie not only failed to comply with the Contract by not hiring a replacement architect for several months, but Labarthe, the replacement architect, also failed to comply with the Contract by among other things, failing to inspect the home upon receipt of CHC's punch as required by Section 9.8.3 of the General Conditions.[14]

Andrejczak testified that after sending Labarthe the Certification of Substantial Compliance and its detailed punch list in January 2017, CHC had "difficulty getting any kind of cooperation whatsoever" from Labarthe, who refused to walk the home with CHC using CHC's punch list, and instead Labarthe sent a series of emails with dozens of nondescript photographs, some of which related to

---

[14] Section 9.8.3 of the General Conditions states:

> Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or a designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

41

items that were already on CHC's punch list. According to CHC, it and its subcontractors spent considerable time trying to locate the items on Labarthe's pictorial punch list within the home, and Labarthe herself could not locate some of the items she had photographed. Andrejczak testified that Blackie's failure to hire Labarthe for several months and Labarthe's failure to work with CHC to complete the punch list in a timely fashion or otherwise comply with the closeout procedures materially delayed CHC from achieving final completion of the project.

Blackie argues that CHC did not fully perform the Contract, and thus was not entitled to final payment, because there were outstanding items on the punch list that had not been resolved when CHC filed suit against Blackie. CHC argues otherwise. According to Andrejczak, "fully performed" means the house was built in accordance with the Contract's plans and specifications and all punch list items have been performed or corrected. Andrejczak and Brantley testified that CHC's work on the home, including the pool, interior doors, and detached garage, was done in accordance with the Contract's plans and specifications and the issues with the pool, the detached garage's floor, and the interior doors were the result of design choices or flaws, and not construction errors attributable to CHC.[15]

---

[15]    Section 3.12.10 of the General Conditions provides in part that:

The Contractor shall not be required to provide professional services that constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the

When asked if CHC had constructed the detached garage in accordance with the Contract, Labarthe admitted that she had previously testified that the detached garage's slab did not deviate from the structural or the architectural drawings. And she testified that there were modifications made to the pool's design change and she did not know if the pool had been built in accordance with the Contract's plans and specifications because she never received the revised drawings. Labarthe also testified that the interior doors were not constructed in accordance with the Contract because the gaps around the escutcheon plates were the result of CHC's failure to ensure that the doors were mortised correctly. Labarthe, however, admitted that CHC's offer to fix the gaps by replacing the escutcheon plates with specially fabricated commercial escutcheon plates that would fill in the gap "would have been possibly fine" if the new places fit precisely.

---

Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. . . . If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner and the Architect will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. . . . The Contractor shall not be responsible for the adequacy of the performance and design criteria specified in the Contract Documents.

With respect to the stained soffits and the scuffed and stained portions of deck, Andrejczak testified that CHC made reasonable offers to correct the alleged defects with the soffits and deck, but Blackie and Labarthe rejected CHC's proposals. In her testimony, Labarthe agreed that CHC's offer to sand down the affected soffits and re-stain them and include an additional one-year warranty to ensure against the soffits aging differently was "not an unreasonable proposal."

Andrejczak testified that CHC complied with its obligations under Section 9.8.2 of the General Conditions by preparing and submitting to Labarthe "a comprehensive list of items to be completed or corrected prior to final payment." On January 4, 2017, CHC emailed to Blackie-Sengel the Certificate of Substantial Completion that Andrejczak originally issued on December 30, 2016, along with a detailed, 19-page punch list listing the items that needed to be completed or corrected prior to final payment as required by Section 9.8.2. Andrejczak and Brantley testified that CHC and its subcontractors completed every item on their punch list as well as most of the items included in the nondescript pictorial lists sent by Labarthe. According to Brantley, CHC tried to locate and identify the items in Labarthe's photographs, but they were not able to find all of them, and even Labarthe did not know where to find some of the items she had photographed, further admitting that most of the items depicted in her pictorial punch list were cosmetic or aesthetic items.

According to Brantley, some of the issues Labarthe identified were already on CHC's punch list. Andrejczak also testified that the "punch list items had been completed" when CHC filed suit against Blackie in May 2017. According to Andrejczak, "the only things that we were working on [on the Project] would have been warranty items or either the pool."

Section 9.10.2 of the General Conditions obligated CHC to provide certain documentation to Labarthe before receiving final payment. Section 9.10.2, as modified by the parties, states:

> Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which Owner and Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment, (5), if required by Owner, other data establishing payment or satisfaction or obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner, (6) all owner operating manuals and manufacturer warranties on equipment installed on the Property, and (7) a Final Certificate of Occupancy for the Work, unless the delay in the issuance of the Final Certificate of Occupancy is due to deficiencies in the design documents (other than those prepared by Contractor or its subcontractors), Owner's responsibilities or other causes beyond the reasonable control of Contractor, (7) as-built drawings for the Work depicting the exact locations of all Work on plm1 sheets, (8) all written

45

guaranties and warranties relating to the Work, (9) all operation and/or maintenance manuals and operating instructions relating to the Work, and (10) satisfactory evidence that all training required under the Contract Documents has been provided. Final Completion is contingent upon items (1) through (10) above being completed. If a subcontractor refuses to furnish a release or waiver required by the Owner, Owner shall have the option to require the Contractor to furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If any such recorded lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorney fees.

Andrejczak testified that CHC complied with Section 9.10.2 by submitting the following items to Labarthe: (1) affidavits stating that payrolls, bills for materials, and other indebtedness had been paid, (2) a certificate that insurance would remain in place for thirty days, (3) a written statement from CHC regarding the renewability of insurance, (4) lien waivers, (5) operating manuals and manufacturer warranties, (6) as-built drawings, (7) all written guarantees and warranties, (8) operation and maintenance manuals, and (9) evidence that requisite training had been provided.

CHC thus provided evidence that it complied with the Contract by issuing a Certificate of Substantial Completion, issuing a detailed punch list to Labarthe, working with Blackie to resolve all outstanding issues on the punch list, and providing all documents required under Section 9.10.2 of the General Conditions. Although Labarthe testified that the interior doors had not been constructed in accordance with the Contract's plans and specifications and that CHC had failed to correct the items on the punch list, it was the jury's responsibility to assess the

46

credibility of the witnesses and resolve any conflicts in the evidence and we defer to jury's resolution of those issues. *See Gunn*, 554 S.W.3d at 665 (stating jury is sole judge of witnesses' credibility and weight to give their testimony and it is jury's province to resolve conflicts in evidence and courts presume jury did so in accordance with verdict and defer to jury's determination of these matters).

### 3. Final Accounting, Final Application for Payment and Certificate for Payment

CHC argues that Blackie was required to pay the outstanding balance due on the Contract because CHC was entitled to final payment under Section 7.2.1 of the Standard Agreement. According to CHC, the final payment due under the Contract included (1) the $10,704.57 for the pool and second superintendent that Labarthe refused to certify for payment and withheld under PayApp 48, (2) the $544,115.24 in retainage due under PayApp 49 that Labarthe never certified for payment, (3) the $23,758.47 in retainage CHC held back from PayApp 49 to cover any additional work on the project, and (4) $34,951.57 in unbilled costs CHC discovered during the litigation.

Section 7.2.1 of the Standard Agreement states:

Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Construction Manager when:

> 1. the Construction Manager has fully performed the Contract except for the Construction Manager's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A20l-

47

2007, and to satisfy other requirements, if any, which extend beyond final payment;

2. the Construction Manager has submitted a final accounting for the Cost of the Work and a final Application for Payment; and

3. a final Certificate for Payment has been issued by the Architect.

The amendment to Section 7.2.1. states that Blackie and CHC "understand and agree that the phrase 'entire unpaid balance of the Contract Sum' is intended to include retainage."

Andrejczak testified that he prepared the required final accounting, and he sent it to Blackie before CHC filed suit. According to Andrejczak, the final accounting he submitted to Blackie for the Cost of the Work consisted of a detailed schedule of values that accompanied PayApp 49 and a job cost detail report that itemized every cost and payment. Andrejczak testified that every cost item was included in the continuation sheet and schedule of values attached to PayApp 49, and he explained how all costs were calculated and that the costs were a summary of the detailed accounting set out in the job cost detail report he also compiled. Andrejczak explained how the documents he provided tied together and that he reconciled them to ensure the information was correct.

Blackie disputes that CHC provided the accounting necessary under Section 7.2.1. Labarthe testified that she did not receive anything she "would consider a final accounting of the project. And Blackie argues that the documents provided by

CHC did not provide information sufficient to allow Labarthe or Blackie to review the accounting on the project.

Given the parties' conflicting testimony on this point, the jury, as the sole finder of fact, was tasked with weighing the evidence, assessing the credibility of the witnesses, and resolving any conflicts in the evidence. We defer to jury's resolution of those issues. *See id.* (stating jury is sole judge of witnesses' credibility and weight to give their testimony and it is jury's province to resolve conflicts in evidence, courts presume jury did so in accordance with verdict, and defer to jury's determination of these matters).

**D.    Disputed Amounts Included for Final Payment**

Andrejczak testified that the final Application for Payment included the $23,758.47 in retainage CHC held back from PayApp 49. It is undisputed that CHC never submitted a separate Application for Payment of the $23,758.47 in retainage. Because CHC did not submit a final Application for Payment, it also did not obtain a final Certificate for Payment for payment of that amount from Labarthe. CHC's failure to submit a final Application for Payment and obtain a final Certificate for Payment from Labarthe for the $23,758.47, however, was not fatal to its breach of contract claim because the law does not require a party to perform a futile act. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594–95 (Tex. 2008); *see also M7 Capital LLC*, 312 S.W.3d at 222 (stating to prove it performed or tendered performance

under contract, party had to prove either that it complied with contract's provisions, offered to perform and was able to do so, or that there was some valid excuse for its failure to perform). The jury could have reasonably concluded from the evidence, including Blackie-Sengel's April 6, 2017 email sent to her team stating that the upcoming project walk through with CHC would help "pave the road to what I would like to do legally" and Blackie's continued refusal to pay any amount due under PayApp 49, that Blackie had no intention of paying the outstanding balance on PayApp 48 or the $544,115.24 in retainage billed under PayApp 49. Thus, it would have been futile for CHC to submit yet another final Application for Payment for the remaining $23,758.47 in retainage CHC had withheld from PayApp 49. *See DiGiuseppe*, 269 S.W.3d at 594–95 (stating tender of performance required by contract excused when tender would have been useless or futile).

Blackie also argues that CHC was not entitled to recover the $5,555.55 for pool costs included in PayApp 48, which Labarthe withheld from payment "until all [pool] leaks [were] resolved" because the problems with the pool existed when PayApp 48 was issued and persisted even after CHC sued Blackie, and thus Labarthe was "within her contractual right to deny a small portion of that payment application allotted to the pool." CHC presented evidence, however, that the pool had been constructed in compliance with the Contract's plans and specifications and that it was not responsible for the leaks, which were subsequently resolved. It was the

50

jury's providence to resolve conflicts in the evidence, and we defer to the jury's determination on this issue. *See Gunn*, 554 S.W.3d at 665 (stating jury resolves conflicts in evidence and courts defer to jury's determination).

Blackie also argues that CHC was not entitled to recover the $5,149.02 included in PayApp 48 for the second superintendent which Labarthe withheld from payment because CHC's unilateral decision to retain a second superintendent was "not authorized by the Contract." She also argues that CHC was not entitled to the $34,519 in charges CHC learned about during the litigation because CHC never billed Blackie for the newly discovered costs. It appears from the record, however, that the jury did not award those damages to CHC. In its closing argument, CHC's counsel stated that CHC was asking for damages in the amount of $392,123.06. CHC's counsel explained that amount was based:

> upon the $10,000 holdback on pay app 48 [for the pool and second superintendent], the application for payment No. 49, the $544,000 [in retainage], the amount that we withheld on pay app 49, which is the $23,000, and the additional amounts for -- it was that even Sally Blackie-Sengel admitted were legitimate and could be charged.

In its brief, Blackie breaks down CHC's requested damages as follows:

| Description | Amount (dollars) |
|---|---:|
| PayApp 48 – Unpaid Remainder | 10,704.57 |
| PayApp 49 | 544,115.24 |
| PayApp 49 – Amount CHC Held Back | 23,758.47 |
| Amount Never Billed to Blackie | 34,951.57 |
| Less Credits | (221,406.79) |
| **TOTAL CLAIM** | **392,123.06** |

51

The jury awarded CHC $352,022.47 in damages, which is $40,100.59 less than the $392,123.06 requested. The jury thus apparently awarded CHC its requested damages, except for (1) the $34,951.57 in unbilled costs discovered during litigation, and (2) the $5,149.02 from PayApp 48 for the second superintendent. There is thus nothing for us to review on these two elements of damages.[16]

After considering the evidence before the jury, crediting evidence in support of the verdict if reasonable jurors could, and disregarding evidence contrary to the verdict unless reasonable jurors could not, we conclude there is more than a scintilla of evidence supporting the jury's findings that Blackie failed to comply with the Contract and that CHC was entitled to recover damages as a result of Blackie's failure to comply with the Contract. *See City of Keller*, 168 S.W.3d at 819, 823, 827.

We overrule Blackie's first issue.

---

[16] To the extent Blackie argues that the jury's damage award may have included these two elements of damages, Blackie did not object to the broad form jury question which did not segregate the amounts awarded for each element of damages, and thus we may not reverse the jury's award of damages on this basis. *See Turner v. Duggin*, 532 S.W.3d 473, 484, 486 (Tex. App.—Texarkana 2017, no pet.) ("Since the Turners lodged no objection to the lack of segregation in the jury charge of the mental anguish damages from the question pertaining to physical pain damages, we cannot now differentiate between the award of one kind of damage from the other" and affirming award because evidence was sufficient to support award of full amount for one element of damages).

## Exclusion of Evidence

In its second issue, Blackie argues the trial court abused its discretion by excluding evidence that Blackie-Sengel, who was acting on behalf of Blackie with regard to the construction of the home and during litigation, had settled some of Blackie's claims with CHC. CHC argues that Blackie failed to preserve error on this issue because its offer of proof was made after the jury was charged and was thus untimely. Blackie argues that an offer of proof is not required to preserve error arising from the erroneous exclusion of evidence if the substance of the excluded evidence is apparent from the context. TEX. R. EVID. 103(a)(2). We need not decide this issue because even if Blackie had preserved the issue, we conclude the trial court did not abuse its discretion by excluding the evidence. And even if the trial court had abused its discretion, the exclusion of the evidence was harmless.

Blackie argues the trial court abused its discretion by excluding evidence that it had settled its counterclaims against CHC for alleged construction defects, including the cracks in the detached garage's floor, stains on some of the soffits, deck stains, and pool leaks. According to Blackie, although the trial court allowed CHC to present evidence concerning the settled construction defects to explain why Blackie-Sengel refused to pay PayApp 49 and to paint her as "unreasonable" for refusing to pay for work based on such defects, the court would not allow Blackie-

53

Sengel to introduce evidence she had settled Blackie's counterclaims against CHC and that she was thus "was at least reasonable enough to settle these claims."

CHC argues that the trial court did not abuse its discretion by excluding evidence that Blackie-Sengel had settled Blackie's construction defect counterclaims because evidence of settlement is prohibited by Texas Rule of Evidence 408, CHC did not open the door to such evidence, and the exclusion of such evidence did not probably result in an improper judgment.

## A. Standard of Review and Applicable Law

We review the trial court's evidentiary ruling for an abuse of discretion. *JBS Carriers*, 564 S.W.3d at 836. A trial court abuses its discretion when it acts without regard for any guiding rules. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). However, even if the trial court's exclusion of evidence constitutes an abuse of discretion, we cannot reverse the trial court's judgment unless the error probably resulted in an improper judgment. *See JBS Carriers*, 564 S.W.3d at 836. Erroneously excluded evidence "crucial to a key issue" is likely harmful "unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Id*. Determining whether a particular error is harmful depends on the particular case. *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). In making this determination, we review the entire record. *Id.*

Texas Rule of Evidence 408(a) states:

(a)     Prohibited Uses. Evidence of the following is not admissible either to prove or disprove the validity or amount of a disputed claim:

     (1)     furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and

     (2)     conduct or statements made during compromise negotiations about the claim.

TEX. R. EVID. 408(a). Otherwise inadmissible evidence may be admitted if the party against whom the evidence is offered "opens the door." *See Campbell v. Pompa*, 585 S.W.3d 561, 585 (Tex. App.—Fort Worth 2019, pet. denied). If a party is the first to broach an inadmissible subject matter in its opening statement or presentation of evidence, he then is considered to have "opened the door" to evidence on that subject. *See id.* (holding that appellant opened door to evidence regarding nonsuited claims by being "the first to introduce the jury to the existence of [those] claims during opening argument"); *see also Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000) (stating party may open door to admission of otherwise objectionable evidence through witness's testimony that conveys false impression). "When a party opens the door to evidence, [they] may not be heard to complain of the admission of that evidence when offered by the other side." *Campbell*, 585 S.W.3d at 585.

**B.    Analysis**

Blackie argues that although settlement negotiations are typically not admissible under Texas Rule of Evidence 408, it was nevertheless entitled to offer evidence that Blackie-Sengel had settled Blackie's construction defect counterclaims because CHC "opened the door" to such evidence when it elicited testimony regarding whether CHC's work comported with the Contract's plans and specifications. *See* TEX. R. EVID. 408(a); *Campbell*, 585 S.W.3d at 585 (stating otherwise inadmissible evidence may be admitted if party against whom evidence is offered "opens the door"). The trial court disagreed with Blackie and found that while CHC's counsel was "knocking" he had not yet "opened the door."

After reviewing the trial transcript, we cannot say that the trial court abused its discretion by excluding evidence that Blackie had settled its construction defect counterclaims. Although CHC elicited testimony regarding the alleged construction defects that formed the basis of Blackie's counterclaims, including the pool leaks, the stained soffits, the deck, and the cracks in the floor of the detached garage, CHC did not make any reference to Blackie's counterclaims or the disposition of such claims.

Moreover, even if the trial court abused its discretion by excluding evidence that Blackie-Sengel had settled Blackie's counterclaims for construction defects, we cannot reverse the trial court's judgment on this basis unless the exclusion of the

56

evidence probably resulted in an improper judgment. Blackie argues that the trial court's exclusion of the evidence was harmful because it allowed CHC to characterize Blackie-Sengel as unreasonable for refusing to pay CHC for its work allegedly because of the construction defects and her "reasonableness goes to the very heart of the case." According to Blackie, evidence that Blackie-Sengel had settled Blackie's construction defect claims would have given the jury "additional context to just how reasonable Blackie[-Sengel] was with regard to these issues."

But Blackie-Sengel's reasonableness is not "crucial to a key issue" in this breach of contract case, a point which Blackie's counsel acknowledged in his closing argument.[17] *See JBS Carriers*, 564 S.W.3d at 836 (stating erroneously excluded evidence "crucial to a key issue" is likely harmful). According to Blackie, the critical issue for the jury is whether the work required under the Contract was finally complete when CHC demanded payment. Similarly, the issue of Blackie's and Blackie-Sengel's reasonableness was not raised in the jury charge. Rather, the jury was charged to decide: (1) whether Blackie failed to comply with the Contract (Jury

---

[17] During closing argument, Blackie's counsel stated:

> The issue that we're asking you to decide—because bear in mind, this is a breach of contract case. The issue you have to decide is whether the work required under the contract was finally complete when Chappell Hill Construction demanded payment. And if you will remember some testimony —we'll come up to that and why that's important because this isn't a, hey, it feels good; Ms. Blackie was reasonable or not reasonable in accepting an offer or not accepting an offer to cure something. This is a breach of contract case.

Question 1), (2) if so, whether its failure to comply was excused because CHC had (i) previously failed to comply with a material obligation of the Contract or (ii) waived Blackie's failure to comply (Jury Question 2), (3) if Blackie's failure to comply was not excused, what amount of money would fairly and reasonably compensate CHC for any damages resulting from Blackie's failure to comply with the Contract (Jury Question 3), (4) whether Blackie failed to pay promptly the amounts owed under PayApp 49 for properly performed work or suitably stored materials (Jury Question 4), (5) if so, whether its failure to promptly pay the amounts owed under PayApp 49 was excused (Jury Question 5), and (6) a reasonable fee for CHC's necessary legal services (Jury Question 6). Because neither Blackie's nor Blackie-Sengel's reasonableness is "crucial to a key issue" in this case, we cannot say that the exclusion of evidence that Blackie-Sengel was reasonable enough to settle Blackie's construction defect counterclaims probably resulted in an improper judgment. *See JBS Carriers*, 564 S.W.3d at 836 (stating erroneously excluded evidence "crucial to a key issue" is likely harmful).

We overrule Blackie's second issue.

### Attorney's Fees

In its third issue, Blackie argues there is legally insufficient evidence supporting the amount of attorney's fees awarded to CHC because CHC did not present sufficiently detailed evidence that would have allowed the jury to decide

58

whether CHC's attorney's fees were reasonable, necessary, or properly segregated. According to Blackie, CHC's billing invoices were so "heavily redacted" they provided no guidance to the jury with respect to the reasonableness and necessity of the work performed and the testimony of CHC's expert on attorney's fees is too general to provide detailed information that is sufficient to overcome such deficiencies. CHC argues the trial court did not abuse its discretion by awarding it attorney's fees because its attorney's fees expert properly segregated his fees and provided sufficient evidence that the requested fees were reasonable and necessary.

## A.    Standard of Review

We review a trial court's award of attorney's fees for an abuse of discretion. *See Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018). We review the amount of attorney's fees awarded for legal and factual sufficiency. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). When reviewing the legal sufficiency of the evidence, we consider the evidence before the jury, crediting evidence in support of the verdict if reasonable jurors could, and disregarding evidence contrary to the verdict unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 827. If there is more than a scintilla of evidence to support the finding, the evidence is legally sufficient. *See id.* at 813. In conducting our review, we are mindful that the jurors, as fact finders, "are the sole judges of the credibility of the witnesses and the weight to give their testimony," and it is the jurors' role to resolve

59

any conflicts in the evidence. *Id.* at 819–20. We must defer to the jurors' determination of these matters and their resolution of conflicting evidence. *Id.*

## B.     Applicable Law

"[A] claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 501–02 (Tex. 2019). Sufficient evidence to support an award of attorney's fees includes, at a minimum, the following evidence: (1) the particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing the services. *Id.* at 502. The evidence must include details about the work performed. *See id.* at 505. This calculation, when supported by sufficient evidence, creates a presumption of the reasonable and necessary attorney's fees that can be shifted to the other party. *Id.* at 499.

To determine the amount of attorney's fees to be awarded, Texas follows the lodestar method, which is a shorthand version of the factors set forth by the Texas Supreme Court in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997). *See Rohrmoos Venture*, 578 S.W.3d at 496. The lodestar method requires the fact finder to determine reasonable attorney's fees by first determining

the reasonable hours spent by counsel in the case and the reasonable hourly rate for counsel's work. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). The fact finder then multiplies the number of hours counsel worked on the case by the applicable rate, the product of which is the base fee or lodestar. *Id.* It is the fee claimant's burden to provide sufficient evidence of both the reasonable hours worked and the reasonable hourly rate. *Rohrmoos Venture*, 578 S.W.3d at 498. Non-exclusive factors courts consider in determining the amount of attorney's fees to be awarded, as set forth in *Arthur Andersen*, include (1) the time and labor required, novelty and difficulty of the questions presented, and the skill required, (2) the likelihood that acceptance of employment precluded other employment, (3) the fee customarily charged for similar services, (4) the amount involved and the results obtained, (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client, (7) the expertise, reputation, and ability of the lawyer performing the services, and (8) whether the fee is fixed or contingent. *Arthur Andersen*, 945 S.W.2d at 818.

Texas law does not allow for recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006). Generally, a party seeking attorney's fees must segregate fees for recoverable claims from those for which they are not. *See id.* at 311; *Sustainable Tex. Oyster Res. Mgmt., L.L.C. v. Hannah Reef, Inc.*, 623 S.W.3d 851, 872 (Tex.

61

App.—Houston [1st Dist.] 2020, pet. denied) (stating party seeking attorney's fees must prove that requested fees have been properly segregated or that segregation is not required).

Under Texas law, the party requesting attorney's fees does not have to segregate fees "when discrete legal services advance both a recoverable and unrecoverable claim" and thus "are so intertwined that they need not be segregated." *Tony Gullo Motors*, 212 S.W.3d at 313–14. Whether it is necessary to segregate attorney's fees is a question of law, but the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Id.* at 312–13.

"[S]egregation evidence need not be extensive to be sufficient." *Kelly v. Isaac*, No. 05-19-00813-CV, 2020 WL 4746589, at *8 (Tex. App.—Dallas Aug. 17, 2020, pet. denied) (mem. op.) (citing *Tony Gullo Motors*, 212 S.W.3d at 314). "[T]o meet a party's burden to segregate its attorneys' fees, it is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours that related solely to a claim for which fees are not recoverable." *RM Crowe Prop. Servs. Co., L.P. v. Strategic Energy, L.L.C.*, 348 S.W.3d 444, 453 (Tex. App.—Dallas 2011, no pet.); *Young v. Dimension Homes, Inc.*, No. 01-14-00331-CV, 2016 WL 4536407, at *10 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, no pet.) (mem. op.) ("[A]n attorney can satisfy his evidentiary burden by presenting evidence of

unsegregated attorney's fees and a rough percentage of the amount attributable to the claims for which fees are not recoverable.").

## C.     Analysis

In support of its request for $838,688.61 in trial attorney's fees, CHC presented testimony from its attorney's fees expert Wayne Rife and invoices showing hours billed, billing rates, and task descriptions.[18]  Rife testified that he has practiced law for over thirty years and his litigation experience consisted of hundreds of construction disputes.  He charges a fixed hourly rate and bills his clients, including CHC, in increments of tenths of an hour.  Rife testified that his hourly rate increased from $325 to $375 during the litigation and his hourly rate is comparable with or slightly below the rate customarily charged in the Washington County area for the type of work performed in this case.  According to Rife, he worked on this case for over five years and he, his legal assistants, and the junior attorneys involved in this case provided approximately 3,750 hours of legal services to CHC.  Rife testified that his work on this case precluded him from accepting additional work during the course of the litigation.

Rife also testified that the litigation was a very complex case which involved issues in different areas of the law and he provided sufficient detail regarding the

---

[18]     Blackie does not appear to be challenging the award of conditional appellate attorney's fees or the amount of costs awarded to CHC.

type of services provided on a case such as this, which involved fourteen depositions, two interlocutory appeals, a petition for writ of mandamus, seven motions filed on behalf of CHC, including three motions to compel discovery, fourteen motions filed by Blackie, five joint motions for scheduling orders, and approximately 50,000 to 60,000 documents that were either generated or produced during discovery. Rife testified that he reviewed pre-bills every month and he would either reduce the number of hours billed for some services or bill the hours but give CHC a courtesy discount which is reflected on the invoices.

CHC introduced into evidence the 252 pages of invoices sent to CHC between October 2016 and April 30, 2022. Based on the invoices, Rife determined that CHC had incurred $1,004,115.11 in attorney's fees as of April 30, 2022, $27,961.50 in attorney's fees between May 1, 2022 and May 4, 2022 (which includes three days of trial), and would incur an additional $7,500 in fees for post-verdict legal services, for a total of $1,039,576 in trial attorney's fees.

Rife testified that he reviewed all of the invoices and determined that $161,888 of the fees billed to CHC were not recoverable. He then subtracted from the $1,039,576 total (1) the $161,888 in non-recoverable fees and (2) the $39,000 in courtesy reductions he had given to CHC, none of which CHC was seeking as part of its attorney's fees. Rife testified that CHC was requesting $838,688.61 in trial attorney's fees, which is the total amount of trial attorney's fees minus the $161,888

non-recoverable fees and the $39,000 in courtesy reductions. Rife testified that $838,688.61 in attorney's fees is reasonable and necessary in this case given the complexity of the litigation, including the extensive discovery and motions practice.

The 252 pages of invoices admitted into evidence corroborate Rife's testimony and reflect the hours billed, the attorney or legal assistant who performed the legal work, their billing rates, and includes a description of the work performed. *See Rohrmoos Venture*, 578 S.W.3d at 502 (stating legally sufficient evidence of attorney's fees includes evidence of particular services performed, when they were performed, who performed such services, and reasonable hourly rate for person performing services, along with some details regarding work performed). While many of the invoices are extensively redacted, the invoices, coupled with Rife's testimony regarding the legal services his firm and the junior attorneys provided to CHC, provided sufficient information to allow the jury meaningfully to assess the reasonableness and necessity of the legal services provided to CHC.[19] *See Tite Water Energy, LLC v. Wild Willy's Welding LLC*, No. 01-22-00158-CV, 2023 WL 5615816, at *11 (Tex. App.—Houston [1st Dist.] Aug. 31, 2023, pet. denied) (mem. op.) (affirming jury award of $1,171,697.50 in attorney's fees when "extensively

---

[19] Rife testified that he redacted information protected by the attorney-client privilege and work-product privilege and "items that are not recoverable in this case." Rife was referring to issues covered by the order in limine, including mediation or other settlement negotiations and settled claims, and any references to the prior mistrial due to a family medical emergency.

redacted" billing invoices coupled with attorney's testimony "provided sufficient information to allow the jury meaningfully to assess the reasonableness and necessity of the legal services").

Blackie argues that Rife's testimony is no more detailed than that of the attorney in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP* which the Supreme Court of Texas held was too general to support an award of attorney's fees. 578 S.W.3d at 506. Blackie's reliance on *Rohrmoos* is misplaced. In *Rohrmoos*, attorney Howard testified at trial in support of the appellee's request for attorney's fees. In support of appellee's requested fees, Howard testified about the volume of electronic and hard-copy document production, the number of depositions, and the extensive motions practice in the litigation. *Id.* at 504–05. The Supreme Court held

> Howard's justification for why his fees should be $ 800,000—searching through "millions" of emails and reviewing "hundreds of thousands" of papers in discovery, more than forty depositions taken, and a forty-page motion for summary judgment—is too general to establish that the requested fees were reasonable and necessary. Without detail about the work done, how much time was spent on the tasks, and how he arrived at the $ 800,000 sum, Howard's testimony lacks the substance required to uphold a fee award.

*Id.* at 505. Unlike in *Rohrmoos*, CHC introduced 252 pages of billing records into evidence. While heavily redacted, the invoices nevertheless supplemented Rife's

testimony and provided the type of detailed information found lacking in *Rohrmoos*.[20]

With regard to the segregation of fees, Rife testified that he reviewed all of the invoices and identified $161,888 in fees that related solely to claims for which attorney's fees were not available, approximately 16.8% of the total fees. Rife testified that although there were fourteen depositions taken in this case, he subtracted the fees associated with one deposition because the deposition was not related to a claim for which attorney's fees were available. When asked why he did not segregate out the fees incurred in connection with the depositions of Barry Atkins and Paolo Benedetti, two expert witnesses who were retained after Blackie filed counterclaims against CHC for construction defects, including one defect associated with the stone wall surrounding the pool, Rife testified that although Atkins, a structural engineer, had been retained to provide expert testimony regarding the stone wall surrounding the pool, the issues involving the stone wall and the leaks in the pool were interrelated and Atkins "testified about things that

---

[20] As just one example, the billing records reflect that Rife spent two hours on February 16, 2020 "[p]repar[ing] for continuation of deposition of S. Labarthe; prepar[ing] deposition outline; assembl[ing] deposition exhibits," and on August 6, 2021, Aaron Hubbard, one of the junior attorneys who worked with Rife in this case, spent 4.4 hours "[f]inaliz[ing] Amended Interrogatory Responses; finaliz[ing] Amended Request for Disclosure Responses and attachments thereto; draft[ing] Motion for Default regarding Third-Party Defendant Atlantis Poolscapes; continu[ing to] Review of Documents." These descriptions are representative of the description of rendered services reflected in other submitted billing records.

related to the leaks." According to Rife, "the major issue with the pool was these water intrusions" and both Atkins and Benedetti, Blackie's pool expert, testified regarding that issue. Rife testified that "the time necessary to prepare for and take those depositions, whether he touched on other items or not, is not the question. The question is, is it so interrelated that the work is recoverable under these as well as others." When asked if fees relating to Blackie's counterclaims were segregated, Rife testified that those fees were not segregated because Blackie's counterclaims involved "issues that dealt with defects" and the claims are "so interrelated that the information and the facts and the evidence applies to both" Blackie's counterclaims and CHC's breach of contract claim.

Rife testified that $161,888 or approximately 16.8% of CHC's attorney's fees was for work relating solely to a claim for which attorney's fees were not recoverable and the remainder of the fees related solely to claims for which attorney's fees were recoverable or involved services for claims that were so intertwined that segregation was not necessary. This is sufficient to meet CHC's burden to segregate its fees. *See RM Crowe Prop. Servs.*, 348 S.W.3d at 453 ("[T]o meet a party's burden to segregate its attorneys' fees, it is sufficient to submit to the fact-finder testimony from a party's attorney concerning the percentage of hours that related solely to a claim for which fees are not recoverable."); *Young*, 2016 WL 4536407, at *10 ("[A]n attorney can satisfy his evidentiary burden by presenting evidence of unsegregated

68

attorney's fees and a rough percentage of the amount attributable to the claims for which fees are not recoverable."); *see also Kelly*, 2020 WL 4746589, at *8 (stating "[s]egregation evidence need not be extensive to be sufficient") (citing *Tony Gullo Motors*, 212 S.W.3d at 314).

After considering the evidence before the jury, crediting evidence in support of the verdict if reasonable jurors could, and disregarding evidence contrary to the verdict unless reasonable jurors could not, we conclude there is more than a scintilla of evidence supporting the amount the jury awarded to CHC for attorney's fees. *See City of Keller*, 168 S.W.3d at 811, 813, 827.

We overrule Blackie's third issue.

## Conclusion

We affirm the trial court's judgment.



                                              Veronica Rivas-Molloy
                                              Justice


Panel consists of Justices Kelly, Landau, and Rivas-Molloy.